thank you your honor may it please the court I'd like to first address the issue of the taser summary judgment that summary judgment was improperly granted because in the taser warning there are discussions about there being a risk of serious injury and fatal injuries but they never relate those risks to the use of the taser in fact they on page 40 of the taser supplemental excerpt of records under the heading that says other conditions there is a reference or a statement by taser in the warning that says unrelated to taser exposure medical conditions such as excited delirium exhaustion drug intoxication chronic drug abuse and over exertion from physical struggle may result in serious injury or death that's the only place that I can find in the taser warning material that says anything about death there are discussions of suggestions of avoiding prolonged exposure to a taser but no connection of that action to the risk of there being death resulting from the officers conduct with the taser taking it back again what would you have what would you in combination with other things that might be happening or the taser alone being overused there's a risk of death or something along those lines well what do you think of footnote 3 on that same page that deals with and also footnote 2 on the previous page there is a discussion on both of those of sudden in custody death syndrome which is sort of like sudden infant death syndrome only grown-ups but isn't that also part of their serious warning about the potential for death you know I think it would be a terrific part of a good warning from taser if they excluded that reference unrelated to taser exposure I guess I'm asking a different question you said there's no other reference to the potential for death but if you start on page 39 at the bottom and deployment health risks okay deployment of what of the taser sudden in custody death syndrome is the first thing they talk about under deployment risks and so I guess I'm just wondering why in your view that's not relevant it lists extreme agitation bizarre behavior inappropriate nudity and imperviousness to pain that all that sort of thing which which are physical manifestations and I would say that's an excellent part of the warning if you take out the instruction to officers that that kind of thing is that unrelated to the use of the taser it doesn't say that I'm looking at the bottom of page 39 I guess it's SCR 39 the major caption is deployment health risks and the minor caption is sudden in custody death syndrome awareness and then there's a footnote which identifies some of the physical manifestations now when we depose the officers and you see it in the in record they didn't know about that risk what is the reason that you're arguing a duty to warn case at the moment yes and the question is does this give the law enforcement community enough information and it clearly does if you give the law enforcement community if your taser and you give the law might be something that the taser could do related to causing death but then you go and add that the taser exposure exposure rated to related to what is listed there on page 40 the second paragraph you negate the effect it seems to me you're taking it in my opinion only obviously it seems like it's out of the entire major major premise on page 39 is deployment warnings okay and then it's deployment safety procedures and deployment health risks all of this is premised on deployment that is use of the taser everything that follows is a discussion of using it in various conditions I guess I just don't see that this subparagraph is a sort of separate thing but anyway I guess my question is why why wouldn't a reasonable person reading this look at it all as risks from actual use of the taser including the paragraph that you read in fact if you're looking at it in hindsight site where we're at I can see I'm just reading that way but putting yourself in the position of the officers and they read that well we assume that the officer has read for purposes of this analysis we assume that the officer has read all of this yes okay and given given the judge Graber is one of the deciders here I'm very interested in what her opinion was she said maybe nobody worries about her opinion I know I just I'm saying is all I'm saying is I don't speak for anyone else in having this concern because we the members of the panel haven't discussed the case with each other so if that is and that there is plenty of information in this warning it was available to the officers prior to this incident then we turn to the city case and that has some relevance to the city case well assuming you prevail on the warning issue then we don't then we do have a causation question do we know I don't think there's a causation question before the court I don't believe the trial court reached cause I see all right we'd have to remand if we if we were persuaded by your argument on the warnings then we would have to remand is what you're saying that's my understanding all right at this point all right how about the case against the city okay there is a a portion of the record that indicates that officer Roper the one who initially started out with the taser after he had discharged it several times took took off the cartridge at the nose of the gun taser then pulled the trigger to see the on page 106 of his deposition that's in the excerpt of record for the city page 70 so the the tasing starts out in dark mode which has more of the effect of putting the body into muscle contractions and being incapacitated so Roper puts that cartridge back on and then continues tasing the tasing happened over a period that is described at page 257 of the city's excerpt of record and it's a download of the taser timing of the deployments and you can go through that download and see exactly how long the trigger was pulled and how long the period was between the trigger being pulled and it helps to understand a little bit about what that table means there's a time under local time and next to it a duration and sequence number 75 is the first trigger pull in this instance and at 3753 that was the time there was a seven second duration related to that time it's important to know that that seven seconds ends at the 3753 and then when you analyze it that way you can fit the times together and see that that's how it works well I've done that and figured that there see that there's zero time between the first two triggers one second between the second and third three seconds between the fourth and fifth one second between the fifth and sixth and zero seconds between the sixth and seventh in the first about 30 seconds there is only five seconds of trigger off time this is completely different than the Brooks case that the court this court decided in the past year in that case there were lots of instructions to miss Brooks warnings that she was getting tased if she didn't do something and after one tase she was warned again and a lot of effort put into changing her conduct before another tase was applied very different case than than is before the court here here there was repeated tasing without ever giving an opportunity to Mr. Marquez to hear another warning we're not disputing that there was a we're admitting for purposes of this this hearing that there was a warning before the first taser that was appropriate but from then on if you look at the taser download there was never a period of time looked at in the evidence most favorable to plaintiffs where Mr. Marquez had any opportunity to respond and that's completely ineffective way of getting compliance from someone you're trying to take into custody now well but in terms of your federal claim what do you have to show we have to show that that the the use of force is not a violation of the law the use of force was excessive and there are a lot of cases that can be looked at the Dolore versus Rutherford case the beanbag where there's a warning and we just have to show that some of that force was excessive I don't think we have to show that the first trigger was excessive in fact not arguing that it was there's arguments that he could have done it differently without the taser but we're not arguing that that was inappropriate but once that little girl was gone we're saying that constitutionally use of force is excessive if there's not an opportunity given to Mr. Marquez to respond to instruction and and comply and that but he was in the process of resisting arrest and assaulting the officers well that's looking at it in the light most favorable to the officers statements of what was going on if you look at it in the light most favorable to the plaintiffs and there are videos of what happens to people who are incapacitated as a result of tasering in the record and and people's feet kick people flail around that just happens and the things the officers describe are consistent with Mr. Marquez being incapacitated or partially incapacitated and I say partly because the darts were closer than optimum on his side he got shot into his side they said the officer said he was a little three-year-old when the officer told her to let told him to let go Mr. Marquez didn't let go he was then tased about three and a half inch spread which is not optimum and when it's not optimum you sometimes get less than full incapacity but full pain a perfect explanation for what went on here is that Mr. Marquez was responding to that almost constant tasering and the folks at taser admit that after a tasing it takes a period of time for a person to get recomposed think of all the movies we've seen where people are being tortured and the torture applies electricity or some something to hurt them and then you then they stop to be effective with the pain application to get some kind of performance there has to be an opportunity given to the to the person that something is tried being sought to get from them to comply with the request that was never done here there's nothing in the record to suggest it further I think if the court finds itself thinking that it ought to give deference to what the police officer said a look at the transcripts of the police officer's testimony in their depositions would be enlightening because they just continually refused to answer a question with a vague words and would not did not remember most things completely contrary to what you would see from an officer at a how does that fit with the qualified immunity issue the qualified immunity issue is assisted if they're well by the fact of there being warnings that if the court were to find judge wake who obviously is one of the great district court judges in phoenix thought that there was an adequate warning if there is an adequate warning that repeated prolonged use of taser can cause death then that's in front of the officers they have that information and if they don't have that information they had some problem if you don't have that information then they're doing another audit to find out if the particularly up against going against an objectively looking at what an objectively reasonable officer yes I really don't understand I really don't understand your argument you seem to be saying that it was okay it was reasonable to tase once but not twice when the fellow was flailing where the officer didn't warn before he shot a bean bag and that was a constitutional violation in this context warn once but then you don't warn for 10 15 plus more times of pulling the trigger instead you you continually pull the trigger the officer that is using excessive force without giving the man an opportunity to respond to the use of force respond to the pain compliance effort that the officers claim to have been using how should should he should this an officer with the taser not be required to re-evaluate his actions to evaluate the use of force after each trigger may want to reserve you're down a minute and 40 seconds if you want to reserve or you continue to use the reserve your choice thank you your honor very well now with respect to the city and taser have you agreed upon an allocation of time yes your honor and what is it I'm going to be up for the first 10 minutes addressing the district courts summary judgment ruling on the excessive force claim and at the 10 minute mark I'll turn it over to counsel for taser okay that's a good plan but as you can tell our questions may divert you from your plan so just keep an eye on the clock I will may it please the court my name is Nicholas Asado and I represent the city of Phoenix and police officers Joshua Roper and David Giuliano the officers in this case attempted to use non-lethal less than intermediate force to secure an individual who had committed several violent crimes who posed a significant and immediate threat to several people and who was actively resisting arrest in a matter of seconds these officers went from responding to a Chuck welfare call to hearing the screams of a baby being tortured to then seeing the child seeing that the child was either dead or dying at the hands of Mr. Marquez to discovering another woman in the room naked and covered in blood and then being forced out of the room by Mr. Marquez I cannot think of a more tense uncertain and rapidly evolving event I'd like to start off by addressing the appellant's contention now at oral argument before this court that the cartridge was put back on and that all of the subsequent deployments were in probe mode in before the district court in our motion for summary judgment we attached the affidavit of officer Roper and made clear in paragraphs 37 and 51 of our statement of facts that the cartridge was taken off and remained off after the initial two probe deployments the appellants did not object to that in their controversy is there a counter affidavit of some sort where does Mr. Trumway get that argument he today before this court he's pointing to page 106 of mr. Roper of officer Roper's testimony which is SCR 70 and it's my recollection your honor that immediately prior to this questioning on pages 104 105 which is not attached to this help me find that if I'm looking at 70 which pages at which subpage is it on 106 top left corner what line he didn't specify the line but if we can start at the top the question is after you've held it in front of you like you are right you then put the probe car cartridge back on correct the answer is correct and that takes something like three or four seconds is that probably correct and the answer is in a normal safe environment like our station yeah approximately depending on how long we test it for now it's my my recollection that the that exchange started off with the procedure that officer Roper utilizes when testing in general not necessarily the the art testing in this case that officer Roper was going through his technique of how he would normally test test he take the cartridge off test it and put it back on and that's reflected in the first answer and then that's supported by his subsequent answer when he's talking about in a normal safe environment but but again I this if you keep going on page 109 which is at the bottom of page 70 the question is so all of your taser applications to mr. Roper are they subject to the mark is including those done with the probes attached and those that were drive stun tasers were ineffective so the question I I guess seems to assume that some had probes and some didn't right I think that question actually separates it out the first two being the probe deployments it was taken off and the remainder were drive stun it doesn't use the word to but it does suggest that some were one and some were the other that's correct and and and we can see that the remainder were probe deploy probe deployments when officer Roper opened the door he gave a warning to drop the baby or he would tase mr. Marquez mr. Marquez did not release the baby he deployed the taser in probe mode the darts entered a lot were lodged in his body he deployed the the taser again those are the first two applications that are on the data download report then he testified that he took off the cartridge and this is throughout his PSB interview which is attached to the appellant facts controversy statement of facts throughout the his interview it's very clear that he took the cartridge off and left it off he talks about taking it off and then all the subsequent deployments were in drive stun mode at that point when he was testing it he then was mr. Marquez was then attacking him kicking him so what he did was he jumped over the bed to get a different to get a better position and to allow officer Giuliano enter the room at that time mr. Marquez turned his attention officer Giuliano and officer Roper testified that he had the tip in his interview testified that he stated that he had the taser up in the air in his hand and was trying to control mr. Marquez from behind while mr. Marquez was attacking officer Giuliano so what's the narrow issue before us at this point are we looking at this from the standpoint of whether there's a question of fact I don't know if there's a question of fact and the question is that is there conflicting evidence sufficient to raise a question of fact is that is that where you think we are right the evidence is undisputed that there were six to seven drive stun marks on mr. Marquez's body that's the only evidence that we have that shows how many times that taser actually made contact with his body the use of force in this case is measured by the number of contacts that he had six to seven we also know and it's true that the taser remained in contact with his body and it is also undisputed that we don't know how much electricity was actually discharged but here's what we do know we know that mr. Marquez was flailing around punching kicking moving non-stop until the second he was handcuffed we also know that it was extremely hot he was sweaty he didn't have his shirt off what under those circumstances he didn't have his shirt on I apologize he didn't have his shirt on he was sweaty he was slippery so of those six to seven drive stun deployments at most they were touching his body for a second or two those are the facts it can't be disputed we're here before this court as to whether or not that was a reasonable use of force under the totality of the circumstances and under Graham it certainly was reasonable and if you look if you go to the qualified immunity analysis we further satisfy that and they haven't come up with a single case that prior to the time of this incident it was clearly established that using the taser in the manner that these officers did on that day when confronted with an individual who committed several serious crimes who posed a threat to the officers to destiny to Cynthia and himself and who was actively resisted arrest they haven't pointed to a single case but as of that date that was clearly established as unconstitutional. I have three minutes left of my time unless there's any other questions I'll defer to counsel for taser. No questions. Thank you. Thank you good morning your honor Pam Peterson on behalf of taser international Inc. It is undisputed in this case that Mr. Marquez died of a condition called excited delirium and as to taser's alleged contribution to that plaintiff's own medical causation expert Dr. Anderson could only say that the taser applications may have contributed to his stress level. Now that obviously is not sufficient to establish medical causation in a case like this but we want to focus obviously today on the basis for the trial court's decision which was that taser's warnings were adequate as a matter of law. Because causation isn't in this appeal. It is and I respectfully disagree with Mr. Marquez or Mr. Shumway regarding that your honor. We specifically raised it as a cross issue in our answering brief and in fact plaintiffs briefed it both in their opening and in their reply briefs. It is squarely in front of this course as an alternative ground for affirming the summary judgment. I don't think you need to get there because as with Judge Wake these warnings were extensive, they were specific, they were clear, they were clear, they were specific to the circumstances of this case. We need to focus on plaintiffs have a burden to establish that something that actually killed Mr. Marquez, taser failed to warn about that. And so we're looking at excited delirium and we're looking at stress primarily because that's what their theory is in this case. Just to be sure I understand what you're saying is that if we are not persuaded by your arguments on the warnings we could still look at for example that the officer may have ignored the warnings in which case you would prevail. Absolutely. Both causation as to proximate cause as to the lack of an adequate warning and as to medical causation both of those are in play here. These motions were fully briefed in front of the trial court. They were argued. The record is fully developed. You are in just as good of a position as the district court in terms of deciding that de novo there's no basis to remain. And that for determination here. And on the causation point, let me just briefly say that there is no expert opinion in this case at all to a reasonable degree of medical probability that the multiple applications to Mr. Marquez contributed to his death. Not their expert witness, not the medical examiner. There is no such opinion. And both of those gentlemen in their depositions specifically could not say that had the drive stunts, had the probe deployments not been applied to Mr. Marquez on the day here that he would have survived the incident. They could not say that. So there is no but for causation. Let's get to Mr. Shumway's argument about the warnings. Right. And I think, Your Honors, we're spot on in terms of Taser's warnings with respect to sudden in custody death. So much of the evidence points specifically to that issue. There's an overall prevailing sense that that's what we're talking about here. But specifically if you look at the supplemental excerpt of record on page 38. So the first page of Taser's warnings here, four pages of detailed warnings, there's your symbol box at the beginning, which specifically says that the Taser electronic control device temporarily incapacitates a target and can cause injury. Now, the warning right underneath that is that the Taser electronic control device is the key one that Judge Wake focused on here. Because this deals with injuries and risks of death, specific to how the Taser device operates. I've lost you. I've seen the illustration. So right underneath the symbol where it starts off, Taser electronic control devices are weapons designed to incapacitate a person. All right. Oh, I see. And then you have a serious injury or death. Then you drop down and it says, and physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances, and individual susceptibilities. Which is precisely what happened to Mr. Marquez. He was someone who was exerting himself beyond the physical limitations of his body. He had been in a struggle and screaming for his life. He was screaming and fighting with the daughter and doing this exorcism for hours before the police officers ever arrived. And the individual susceptibilities, of course his prior preexisting heart condition, which was serious as determined by the medical examiner, but in addition to that, his state of excited delirium. The footnote that was referenced relating to the various warning signs, footnote two on SER 39, the various warning signs that were described here fit Mr. Marquez to a T. I mean, TASER did a really nice job with letting the officers know what types of things were risks and what types of things to look out for. There were, in addition to these warnings, which is what plaintiff focus is on, TASER has a comprehensive warning system that includes not only these written warnings being submitted with the device, but they have an extensive training program that includes PowerPoint presentations. This is what the officers are trained on. During the training, they're given handouts of these same warnings that are discussed in detail, but the PowerPoint presentation expands on those warnings and explains them and puts them in the context of the types of things the officers are going to experience in the field. And there's detailed videotape as well showing suspects in the field. There are two videotapes in this particular version 13 that's at issue here that show suspects in the field exhibiting these signs. These are the signs of excited delirium, so that the officers can see what it looks like and recognize it when they see it. And the various symptoms are outlined there. And what TASER says is these people are at an elevated risk for sudden death. Okay, but what is troubling me continues to be the fact that they zap, zap, zap, zap, zap. I don't see, I see warnings that this can cause death, that people have susceptibilities. I see warnings that there are these signs that they're not going to die. And I see warnings that there are these health risks. But I don't, it seems to me if the argument is that he was overexcited, I don't see why there's not a jury question as to whether or not his overexcitement and everything that contributed to his death was in part because somebody was repeatedly zapping him with a TASER. Well, people die in custody all of the time from conditions like excited delirium where a TASER ECD is never used whatsoever, obviously. But it was here. But it was here. But there is no evidence in this record whatsoever that multiple ECD applications would worsen a person's physiology under those circumstances. Plaintiffs did not submit any evidence at all on that point. So first of all, in response to our motion for summary judgment, our statement of facts, plaintiffs admitted each and every fact relating to our warnings. They then, in their 224-paragraph counterstatement, submitted a statement of facts that stated that there was no ECD. And each statement of facts have a mere five paragraphs that address the inadequacy of TASER's warnings. And those five paragraphs are at plaintiff's excerpts of record, page 90-91, they're paragraphs 193-197. They cite only the testimony of two TASER executives and do not relate at all to multiple applications of TASER ECD. They do not present any evidence of a TASER device on an emotionally disturbed person. They're simply not relevant to the issue here before us. They did not present any warning expert. There were not scientific information that was put into the record showing at all. And again, just like in the Rosa case, you have to look back to the time of distribution of the product, which here was in the first instance. And so there's just a lack of evidence in the record to demonstrate that in the first instance. But going specifically, Judge Schroeder, to your, I want to walk you through a couple things in our warnings, because this is dealt with specifically. So if you look on supplemental excerpt of record 39, right above the heading toward the bottom of the deployment health risks, there is a warning that says control and restrain immediately. And so it says begin control and restraint procedures as soon as it's reasonably safe to do so in order to minimize the total exertion and stress experience by the subject. TASER teaches, and in the PowerPoint slides that are also in the record here, they talk about you need to cuff and control under power. You need to move in quickly during that five-second window of opportunity and use your assisting officers to get someone restrained quickly so you don't have to do the multiple applications. Then if you look on the next page, SCR 40, there's a heading that specifically says continuous exposure risks. And it says when practical, avoid prolonged or continuous exposure to the TASER device's electrical discharge. In some circumstances, in susceptible people, exactly like Mr. Marquez in a state of excited delirium, it's conceivable that the stress and exertion of extensive repeated prolonged or continuous application of the TASER device may contribute to cumulative stress, exhaustion and associated medical risks. There are warnings at least four different times in here that say when you are dealing, especially with a person in excited delirium who is already at an elevated risk for a sudden in-custody death, you have to minimize the stress to that person. So you need to minimize the number of TASER applications. They also say if for any reason you're not making progress with using the TASER in terms of getting the person restrained and having it have an effect on them, stop using it. Transition to another use of force method rather than to continue to subject them to the stress of further applications when it's not making progress toward your ultimate goal. So all of those things are in TASER's warnings. So you're saying that what happened here, the police officers were at the bust of what you're saying in the context of what's the case is, that the police officers were acting contrary to the warnings in their force ways. Well, I think the police officers were doing the best they could, obviously under a dynamic, unusual situation. But when you look at Mr. Shumway's argument... They were. And specific to somebody like Mr. Marquez, who's experiencing excited delirium, you need to minimize the stress and exertion to that person, and you need to not do multiple applications on them. Our warnings are very clear about that. And so from a warnings perspective, TASER did everything that it was supposed to do, and certainly everything that the record demonstrates was necessary based on the TASER's knowledge and the medical and scientific knowledge of that person. And so it was very clear about multiple ECD exposures at that point in time. Counsel, since you're on the same warnings material, you recall Mr. Shumway talked about the other conditions? Yes. Subset on page 40 of the record. Would you respond to his argument? Absolutely, Your Honor. And I think this is taken obviously out of context, and Judge Wake was correct when he said, you have to minimize the stress and exertion to that person. And what this provision is doing is alerting the officers that people with these conditions that do absolutely exist separate and apart from a TASER exposure, these are your susceptible people. People with these conditions, excited delirium, severe exhaustion, overexertion from physical struggle, these are your people who are at elevated risk for sudden in-custody death. They're your susceptible people. These are the people that you don't use continuous exposures and repeated applications on, as stated in the immediately preceding paragraph. And so, and also there's a recent decision out of the Southern District of Texas, the Carroll decision, which we cited in our supplemental authorities that we filed, and in that this is exactly what the court held also in very similar circumstances, granting summary judgment to TASER, finding that these repeated application warnings were sufficient as a matter of law, and that that other condition paragraph that we were just discussing, that that identifies the susceptible people to which you shouldn't be using the TASER multiple times. So unless there's anything further, I think that that's it. Thank you, counsel. Mr. Shumway, you have a little reserve time. On the issue of causation, medical causation, paragraphs 204, 205, and 206, and 207, and 208, and 209, and 208, and 209, and 209, and I think 206, and in that area contain the testimony from Dr. Horn and references from even the defense doctors in some of the papers on the subject of the TASER being involved in the constellation of factors that led to the death of Mr. Marquez. So that's established in the record. There was discussion about how much TASER application came with the cartridge-on versus cartridge-off. And how many applications there actually were. Well, at page 174 of the City of Phoenix supplemental excerpts of record, in the footnotes of that page and the next page, the City of Phoenix early on in their internal investigation lists the number of TASER applications they assigned to Officer Roper, the officer that started out with the TASER. Then in the transcript of Officer Giuliani, he admits to seven or eight applications himself separately after the TASER was handed to him later. Another thing that needs to be understood regarding the discussion by Phoenix is that in the case of Mr. Marquez, there was no evidence of blood being on any of the officers in the operating room. There was no evidence of blood being on any of the officers in the operating room. In DART mode, when the wires are in, delivering current, the performance can be enhanced by taking the gun and using it as if it was in drive mode, the TASER I mean, and then you get an extra strong muscle contraction effect. Another point I wanted to make as a result of what they talked about, there's no evidence of blood being on any of the officers in the operating room. In the autopsy report that's in several places in the record, Mr. Marquez's fingers and palm were cut deeply, half-inch and quarter-inch lacerations across the hand. No evidence of blood ever getting on these guys. The blood on the wall, there are pictures in TASERs, and there are references in the officer's testimony to them being behind him, hitting in the lat, some of the applications are to the back, and they all said he always was on the back of the TASER. The blood on the wall, the blood on the wall, you can see the blood on the wall, he was in the operating room, he was on the bed, either laying or kneeling, never got off, but he had superhuman strength. It doesn't add up. The blood on the wall, I mean, you can see him there wiping the wall. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Schroeder, O'scannlain, Graber